WILLIAM R. LUCERO, PRESIDING DISCIPLINARY JUDGE
In 2011, Patrick C. Hyde ("Respondent") was entrusted with $1,000.00 for legal work in an immigration case. He kept inadequate records regarding that payment. Even though he never performed legal services in the matter, he erroneously assumed two years later that he had somehow earned the funds. As a result, he transferred the $1,000.00 from his trust account into his operating account, commingling the funds with his own. Respondent's breach of Colo. RPC 1.15(a) and 1.15(j) warrants a six-month suspension with the requirement that he petition for reinstatement, if at all, under C.R.C.P. 251.29(c).
*480 I. PROCEDURAL HISTORY
Jacob M. Vos, Office of Attorney Regulation Counsel ("the People"), filed a complaint with Presiding Disciplinary Judge William R. Lucero ("the PDJ") on May 25, 2018, alleging that Respondent violated Colo. RPC 1.15(a) (2013), 1.15(i)(6) (2013), and 1.15(j) (2013).[1] Respondent answered on June 15, 2018, denying the People's claims.
Respondent moved to dismiss the case on statute of limitations grounds on September 5, 2018. The PDJ denied the motion two weeks later, finding that Respondent did not timely raise the defense. On October 1, 2018, the PDJ denied Respondent's motion to discharge a previous disciplinary order entered in case number 15PDJ103.
On October 2, 2018, a Hearing Board comprising the PDJ, attorney W. Eric Kuhn, and lay member Matthew T. Daly held a hearing under C.R.C.P. 251.18. Vos represented the People, and Respondent appeared pro se. The Hearing Board considered stipulated exhibits S1-S9, Respondent's exhibit A, the People's exhibits 2-4, and the testimony of Yesica Trujillo, Armando Ramos,[2] William O'Donnell,[3] and Respondent.
II. FACTS AND RULE VIOLATIONS
Factual Findings[4]
This case centers on Respondent's alleged representation of Yesica Trujillo and Armando Ramos in Ramos's removal case. Respondent is a Denver-area immigration lawyer who has been practicing since 1985. Trujillo, a U.S. citizen, has been married for nearly a decade to Ramos, and the couple has three children. Ramos was born in El Salvador. He has lived in the United States without legal status since 2003, working as a roofer. Ramos is subject to a 2008 removal order, but he remains in Colorado with his family.
The facts underlying this disciplinary case as recounted by Respondent differ markedly from the facts as recounted by Trujillo and Ramos. We present a brief summary of the two narratives followed by a synopsis of the facts we find to be established by clear and convincing evidence.
According to Trujillo and Ramos, Ramos who had been living in Florida, came to Colorado for work in 2007. He and Trujillo fell in love and they married in 2009. In 2011, they visited Miami, where they found sealed letters mailed to Ramos's previous address, informing him that he was subject to removal proceedings. After returning to Colorado, the couple met with Respondent in mid-October 2011. At the meeting, which lasted less than an hour, Respondent advised Ramos that he should move to reopen the removal proceeding, which would cost $1,000.00. A day or two later, Trujillo and Ramos brought Respondent a $1,000.00 money order for the legal fees. Respondent copied relevant documents belonging to Ramos. Respondent never asked for Trujillo's contact information, nor did he indicate that he needed any additional information to draft the motion. The couple understood that Respondent was their lawyer. Trujillo later tried to reach Respondent on several occasions but had no success. In 2017, she learned to her dismay that Respondent had never filed a motion to reopen for Ramos.
Respondent, by contrast, maintains that Ramos married Trujillo in a ploy to gain legal status only after learning that he was subject to removal proceedings. Respondent asserts that he never once met Ramos. Instead, he said, Trujillo came to his office alone and specifically requested that he prepare a motion to reopen Ramos's removal proceeding, though she provided only sparse details about the matter. Respondent urged her to leave her contact information and fill out an intake sheet, but she refused to do so. Although Respondent preferred for Ramos to directly pay the legal fees, Trujillo insisted *481 on giving him the $1,000.00, saying that she had worked hard to save the money and she did not want an emergency to come up that she might spend the money on instead. Respondent accepted Trujillo's money order on the understanding that Ramos would visit his office to discuss his case. Respondent never again heard from Trujillo or Ramos, and he never received any documents relevant to Ramos's case. As he understands the facts today, Respondent believes Ramos had no legal right to file a motion to reopen, so Respondent insists he would not have accepted the representation if he had received detailed information about Ramos's situation in 2011.
Lacking that information at the time, Respondent testified, he placed the $1,000.00 in his trust account upon receipt. He created a file bearing Trujillo's and Ramos's names, but the file remained empty because the couple never provided any documents. He did not cross reference Trujillo's and Ramos's names in his records. As a result, when he noticed the $1,000.00 payment in Ramos's name some two years later and could not remember who Ramos was, Respondent figured that Ramos had paid legal fees for some client for whom Respondent had already performed legal services. So, he transferred the money to his operating account. Respondent maintained that he reconciles his trust account daily, making sure that his balance in his financial accounts reflects the figures on his handwritten data sheets and in his QuickBooks records.
The Hearing Board has carefully considered Respondent's account of the facts and Trujillo and Ramos's account, but we find neither narrative wholly credible.[5] We also find, however, that we can decide the merit of the alleged rule violations without pinning down many of the disputed facts.[6] In large part, this is because the applicable rules govern practices and recordkeeping related to any funds held in trust in connection with a representation, whether belonging to clients or to third parties.
The Hearing Board finds established by clear and convincing evidence the biographical information set forth in the first paragraph of this section. We also find established the following:[7] Trujillo spoke to Respondent about Ramos's case on October 18, 2011, and gave him a $1,000.00 money order for work that she believed he would perform in the case.[8] The memo line of the money order reads "Attorney fees," and Trujillo wrote in a street address with an apartment number.[9] Respondent provided a receipt with the notation "Motion to Reopen."[10] On October 19, 2011, Respondent deposited the $1,000.00 into his trust account under the name "Armando Benjamin Ramos Estrada" with a note "Mt reopen."[11] This payment was reflected in *482 Respondent's QuickBooks records.[12] On July 26, 2013, Respondent transferred $1,000.00 in the name of "Armando Ben Ramos Estrada" from his trust account into his operating account.[13] When Respondent did so, he had not performed any legal work for Ramos.
In addition to his QuickBooks records, Respondent maintained handwritten records that he labeled "Datasheet Statistics/Trust Acc."[14] These records consist of dates, client numbers, and dollar amounts, with some other notations.[15] Respondent created a case file folder labeled "Ramos, Armando[,] Trujillo, Yesica."[16]
In 2017, Trujillo and Ramos hired immigration attorney William O'Donnell, who moved to reopen the removal case. The motion to reopen involves an assertion that Respondent provided ineffective assistance of counsel. O'Donnell contacted Respondent in February 2017, expressing concern that he had never filed a motion to reopen for Ramos and asking him to refund the $1,000.00.[17] Respondent replied, claiming that the couple had just "drop[ped] everything."[18] He offered to give Trujillo $750.00, reflecting the $1,000.00 payment minus a consultation fee of $250.00.[19] When O'Donnell insisted on a full refund,[20] Respondent complied in March 2017.[21]
Rule Violations
Colo. RPC 1.15(a)
Colo. RPC 1.15(a) states: "A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property." The People claim that Respondent converted Trujillo's funds by transferring the $1,000.00 out of his trust account in 2013 and using the money for his own purposes. Respondent, meanwhile, insists that trust accounts are reserved solely for client funds. Since neither Trujillo nor Ramos was an actual client, he maintains, he acted properly by transferring the $1,000.00 out of his trust account because to retain those funds in trust would be to engage in commingling.[22]
The Hearing Board finds that Respondent violated Colo. RPC 1.15(a) when he transferred the $1,000.00 into his operating account.[23] Respondent is incorrect in his purported understanding of trust accounts.[24] By the plain language of the rule, trust accounts are for funds belonging not only to clients but also to third persons. Comment 1 to Colo. RPC 1.15 indicates that the scope of property subject to the rule is broad: "A lawyer should hold property of others with the care required of a professional fiduciary.... All property that is the property of clients or *483 third persons should be kept separate from the lawyer's business and personal property and, if monies, in one or more trust accounts." Even if Trujillo was not his client-a question we need not reach here-she was a third party who entrusted him with money for an expected representation of her husband.[25] Indeed, Trujillo's money order was for "Attorney fees," the receipt she received was for a "motion to reopen," and Respondent created a case file for the anticipated representation. It is undisputed that Respondent never earned the $1,000.00 in question. Regardless of whether he believed for a time that he had somehow earned the funds due to his failure to recognize Ramos's name, he nonetheless violated the rule because it is a lawyer's duty to ensure that records are clear and accurate enough to prevent the transfer of unearned funds out of trust accounts.
Colo. RPC 1.15(i)(6)
Colo. RPC 1.15(i)(6) requires lawyers, on at least a quarterly basis, to "reconcile ... trust account records both as to individual clients and in the aggregate with the lawyer's trust account bank statement(s)." According to the People, Respondent failed to reconcile his trust account records quarterly between October 2011 and July 2013.
This claim presents a close question. The relevant records are not particularly detailed, but they do provide some evidence of reconciliation during the relevant timeframe.[26] Notably, the rule does not require lawyers to memorialize in writing their reconciliation efforts, nor does the rule define the term "reconcile." Here, Respondent testified that he regularly reconciled his trust account when he made deposits. He said that he knew that his bank accounts, his QuickBooks records, and his handwritten records matched up as to relevant amounts of funds. Though the records at issue here do present some cause for concern about Respondent's diligence in reconciling his accounts, the evidence as to this claim is somewhat scant, so the Hearing Board finds that the People did not prove a violation by clear and convincing evidence.
Colo. RPC 1.15(j)
Colo. RPC 1.15(j) states:
A lawyer ... shall maintain in a current status and retain for a period of seven years after the event that they record: (1) Appropriate receipt and disbursement records of all deposits in and withdrawals from all trust accounts and any other bank account that concerns the lawyer's practice of law, specifically identifying the date, payor and description of each item deposited as well as the date, payee, and purpose of each disbursement ... (2) An appropriate record-keeping system identifying each separate person or entity for whom the lawyer holds money or property in trust , for all trust accounts, showing the payor of all funds deposited in such accounts, the names and addresses of all persons for whom the funds are or were held , the amount of such funds, the description and amounts of charges or withdrawals from such accounts, and the names of all persons to whom any such funds were disbursed.[27]
The People allege that between October 2011 and July 2013 Respondent failed to maintain and retain records as required by this rule. The Hearing Board agrees. Respondent did not "show[ ] the payor" of the funds he received, because he recorded only Ramos's name in his accounting records, not Trujillo's.[28] He also failed to record Ramos's *484 and Trujillo's address. Though Respondent blames Trujillo for not giving him a valid address, it appears to the Hearing Board that Trujillo did provide a good address and that Respondent did not list the address on his accounting records. And if Respondent had found fault with the address, it was his own responsibility to collect an address that he deemed acceptable. If Trujillo refused to provide the information Respondent needed to comply with Colo. RPC 1.15(j), he should have refused to accept her money.
III. SANCTIONS
The American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards ")[29] and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[30] When imposing a sanction after a finding of lawyer misconduct, a hearing board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that may be adjusted based on aggravating and mitigating factors.
ABA Standard 3.0-Duty, Mental State, and Injury
Duty : Although we do not reach the question of whether Trujillo or Ramos were actual clients of Respondent,[31] the ABA Standards make clear that the rule violations at issue here go to a lawyer's client-centered duties to preserve and maintain records of funds related to a representation. We also find that these rules implicate the professional duties of lawyers.
Mental State : Respondent knew or should have known that he was improperly handling funds belonging to others and improperly maintaining records. His records contained enough information-a record showing a $1,000.00 payment in Ramos's name on October 19, 2011, and a file folder bearing Trujillo's and Ramos's names-that he could have made sense of the $1,000.00 payment had he made a diligent effort to do so. His records should have contained additional information regarding Trujillo and Ramos in relation to the $1,000.00. Even if Respondent was genuinely confused about the source of the money, as he asserts, that confusion reflects his own failure to comply with the Rules of Professional Conduct by maintaining appropriate records. Additionally, he testified that he did not know where the funds had come from. Rather than continue to hold them in trust and attempt to identify their source, he assumed, in his own favor, that he must have earned them. We thus find he had the "conscious awareness of the nature or attendant circumstances of [his] conduct," even though he may have lacked "the conscious objective or purpose to accomplish a particular result."[32]
Injury : The $1,000.00 at issue here represented a large sum to Trujillo and Ramos, who have limited financial resources. By failing to keep appropriate records that would have allowed him to timely return the unearned legal fees, Respondent financially harmed Trujillo and Ramos. Further, any time a lawyer fails to keep unearned fees in trust, the lawyer causes the owner of the funds potential injury. The requirement that lawyers hold in trust any fees belonging to clients or third parties serves to safeguard those fees.[33] Last, Respondent's disregard of the applicable rules harmed the public and the legal profession by undermining the public's trust in lawyers. Indeed, Trujillo and *485 Ramos testified that their faith in the legal profession was diminished through their experiences with Respondent.
ABA Standards 4.0-7.0-Presumptive Sanction
Suspension is the presumptive sanction for Respondent's mishandling of funds under ABA Standard 4.12, which applies when a lawyer knows or should know that he is dealing improperly with client property and causes a client injury or potential injury. As for Respondent's inadequate recordkeeping, we believe the relevant standard is Standard 7.2, which calls for suspension when a lawyer knowingly engages in conduct that violates a duty owed as a professional, causing injury or potential injury to a client, the public, or the legal system.[34]
ABA Standard 9.0-Aggravating and Mitigating Factors
Aggravating circumstances include any considerations that may justify an increase in the degree of the sanction to be imposed, while mitigating factors may warrant a reduction in the severity of the sanction.[35] As explained below, we apply five factors in aggravation, one of which is entitled to great weight, as well as two mitigating factors. The Hearing Board evaluated the following factors.
Aggravating Factors
Prior Discipline-9.22(a) : In 2008, Respondent stipulated to a private admonishment. In the underlying case there, he failed to review an immigration application that his assistant prepared, and the application was denied because it was insufficient on its face. He also did not adequately communicate with the client about that application. We consider his prior discipline in aggravation.
Dishonest or Selfish Motive-9.22(b) : Although Respondent did not display outright dishonesty in this case, his conduct does reflect a selfish outlook. He took the path that was easiest and most financially beneficial for him, rather than genuinely striving to do right by others. Respondent appears to take a rather narrow view of his duties as a lawyer, sidestepping those duties when he can find a rationalization for doing so.
Pattern of Misconduct-9.22(c) : Although Respondent's conduct in the case at hand does not reflect any particular pattern of misconduct, we do find themes here in common with his 2016 disciplinary case. We consider that case under the rubric of a pattern of misconduct because the misconduct in the instant case occurred before Respondent's suspension in 2016.[36] There, Respondent was suspended for one year and one day, with three months served and the remainder stayed upon successful completion of a two-year period of probation. In that underlying representation, he failed to adequately explain important legal matters to a client and did not set forth the basis or rate of his fees in writing. He also made a misrepresentation by omission by neglecting to tell his client that she had paid him $500.00 more than the balance reflected in his own accounting ledger. In both the instant matter and the 2016 case, Respondent made accounting-related "errors" that accrued to his financial benefit, and we thus find a pattern of misconduct.
Refusal to Acknowledge Wrongful Nature of Conduct-9.22(g) : Although Respondent has attended trust account school in connection with his 2016 discipline, he refuses to recognize that he acted improperly with respect to Trujillo's $1,000.00 payment. Respondent contends that he was simply "confused" about the funds and rules at issue. But the applicable rules are in fact quite clear. Further, Respondent asserted that Trujillo did not "deserve the equity of the court" and implied the same about Ramos, repeatedly characterizing him as a "fugitive *486 from justice." These statements suggest, in a manner ill-befitting a member of the legal profession, that close cases should be resolved in favor of the lawyer, notwithstanding the lawyer's own misconduct, and that clients who have committed criminal conduct are entitled to lesser protection under the rules.
Vulnerability of Victim-9.22(h) : Given that Ramos is subject to a removal order and could be forced to leave the United States at any time, both Ramos and Trujillo are certainly vulnerable victims, as Respondent concedes.
Substantial Experience in the Practice of Law-9.22(i) : Respondent has practiced law since 1985. With this long tenure in the legal profession, Respondent should have been very familiar with the Rules of Professional Conduct governing trust account management. We accord significant weight in aggravation to this factor.
Mitigating Factors
Timely Good Faith Effort to Make Restitution-9.32(d): Respondent repaid Trujillo the $1,000.00 that he owed her within about a month of the initial request, although O'Donnell had to press him to do so. The Colorado Supreme Court has indicated that even restitution made after the initiation of disciplinary proceedings merits at least some weight.[37] As such, the Hearing Board finds it appropriate to give Respondent credit here for his return of Trujillo's funds.
Cooperative Attitude Toward Proceedings-9.32(e): The People concede that Respondent has cooperated in this disciplinary case. We thus apply this mitigating factor.
Character or Reputation-9.32(g): Respondent offered some testimony about his history as an immigration lawyer and the high-quality legal services he has provided to clients. This testimony was limited and uncorroborated, and it does not establish good character or reputation by the quantum of clear and convincing evidence.
Remoteness of Prior Offenses-9.32(m): The events at issue here began to unfold in 2011, just three years after Respondent stipulated to discipline in 2008. As such, Respondent's prior discipline is not mitigated by the passage of time.
Analysis Under ABA Standards and Case Law
The Colorado Supreme Court has directed the Hearing Board to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors.[38] We are mindful that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[39] Though prior cases are helpful by way of analogy, hearing boards must determine the appropriate sanction for a lawyer's misconduct on a case-by-case basis. The Colorado Supreme Court has suggested that cases predating the 1999 revision to this state's disciplinary system carry less precedential weight than more recent cases.[40]
The People request a six-month suspension with the requirement of formal reinstatement proceedings, while Respondent appears to believe that no discipline at all is warranted. A served suspension of six months typically is viewed as a baseline sanction, to be adjusted upward or downward in consideration of aggravating or mitigating factors.[41] Colorado case law supports a *487 served suspension as the sanction for mishandling client funds, depending on the circumstances.[42] Indeed, the Colorado Supreme Court has commented that "[w]hen ... a lawyer knows or should know that he is dealing improperly with a client's property and causes potential injury to the client, a suspension from the practice of law, at the very least, is an appropriate sanction."[43]
Starting from a baseline of a six-month suspension, the Hearing Board considers whether the aggravating and mitigating factors warrant an adjustment in the severity of the sanction to be imposed. Here, the aggravators certainly outweigh the mitigators. In gauging the appropriate sanction, we must also be guided by the primary purpose of attorney discipline-protection of the public.[44] The aggravators here present significant cause for concern, because Respondent has repeatedly committed misconduct despite his substantial experience as a lawyer and because he refuses to acknowledge, or is unable to recognize, his wrongdoing.[45] In addition, during his cross-examination of Trujillo, Respondent revealed that another client-a friend of Trujillo who had referred her to his office-had faced drug smuggling charges. Publicly announcing this information, which included the name of the other client, signals an apparent indifference to Colo. RPC 1.6 (preserving confidential client information). Given the aggravating factors and Respondent's seeming disregard for the Rules of Professional Conduct, we deem the requirement of formal reinstatement proceedings appropriate.
In sum, given the presumptive sanction of a six-month suspension and the weight of the aggravating circumstances here, the Hearing Board chooses to follow the People's recommendation. We impose a six-month suspension with the requirement that Respondent petition for reinstatement, if at all, under C.R.C.P. 251.29(c). Under this rule, Respondent must prove by clear and convincing evidence that he has followed applicable disciplinary rules and orders, has been rehabilitated from his misconduct, and is fit to practice law.[46]
IV. CONCLUSION
By failing to follow recordkeeping requirements and by transferring unearned funds from his trust account to his operating account, Respondent exhibited an indifference to the Rules of Professional Conduct. His conduct warrants a six-month suspension with the requirement of formal reinstatement proceedings.
*488 V. ORDER
The Hearing Board therefore ORDERS :
1. PATRICK C. HYDE , attorney registration number 14633 , will be SUSPENDED FROM PRACTICING LAW FOR SIX MONTHS . The suspension will take effect upon issuance of an "Order and Notice of Suspension."[47]
2. Should Respondent wish to resume practicing law in Colorado, he MUST file for reinstatement under C.R.C.P. 2151.29(c).
3. Respondent SHALL promptly comply with C.R.C.P. 251.28(a)-(c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.
4. Within fourteen days of issuance of the "Order and Notice of Suspension," Respondent SHALL comply with C.R.C.P. 251.28(d), requiring an attorney to file an affidavit with the PDJ setting forth pending matters and attesting, inter alia , to notification of clients and other state and federal jurisdictions where the attorney is licensed.
5. The parties MUST file any posthearing motion on or before Tuesday, December 11, 2018 . Any response thereto MUST be filed within seven days.
6. The parties MUST file any application for stay pending appeal on or before Tuesday, December 18, 2018 . Any response thereto MUST be filed within seven days.
7. Respondent SHALL pay the costs of this proceeding. The People SHALL submit a statement of costs on or before Tuesday, December 11, 2018 . Any response thereto MUST be filed within seven days.
W. ERIC KUHN
HEARING BOARD MEMBER
MATTHEW T. DALY
HEARING BOARD MEMBER

For ease of reading, we omit reference to the year of the applicable rules in the rest of the opinion.

A Spanish translator certified by the State Court Administrator's Office translated Ramos's testimony.

O'Donnell testified as a fact witness and was also accepted as an expert in immigration law.

These findings are drawn from testimony at the disciplinary hearing where not otherwise indicated.

This is so for a number of reasons. As for Respondent, his version of events has shifted notably over time. In addition, his assertion that he believed the rules required him to transfer third-party funds out of his trust account is so patently wrong as to be incredible. As for Trujillo and Ramos, we note that Ramos's immigration case involves an assertion that Respondent provided ineffective assistance of counsel. Some aspects of the couple's story also are hard to credit, such as Trujillo's testimony that she simply assumed Respondent had secured legal relief for Ramos when she could not reach him.

Much of the testimony presented in this case is not critical to our assessment of the alleged rule violations. Significant testimony was devoted to the merits of Ramos's underlying immigration case, which is simply not relevant to whether Respondent properly handled funds and whether he kept required records.

We cannot find clear and convincing evidence on two points: (1) that Ramos did or did not meet with Respondent and (2) that Respondent did or did not promise to begin work on the motion without further client meetings or documentation. In addition, as noted in the legal analysis section below, we do not reach the question of whether Respondent formed an attorney-client relationship with Ramos or Trujillo.

Ex. S4.

Ex. S4. Although Respondent claimed that the address was invalid because it had seven digits, the address appears to the Hearing Board to be a valid address with four digits preceded by a scribbled-out notation. We deem disingenuous Respondent's additional argument that the address was not good because it listed a number on Federal Boulevard but did not specify a city.

Ex. S4.

Ex. S6 at 00085-86.

Ex. S6 at 0085-86; Ex. S7 at 07.

Ex. S6 at 00083.

Ex. S7 at 19-20.

Ex. S7 at 19-20. Respondent testified that although these records normally contain client names, he redacted client names from the records he gave the People in this disciplinary case.

Ex. S7 at 03.

See Exs. S1-S3.

Ex. S1 at 00017.

Ex. S1 at 00014. In explaining why he first offered a refund of $750.00, Respondent said that he initially did not remember whether Trujillo had already paid for a consultation.

Ex. S1 at 00014.

Ex. S3.

Somewhat inconsistently, Respondent justifies his initial deposit of the $1,000.00 payment into his trust account on the grounds that Ramos was a possible future client at the time.

The People allege as part of this claim that Respondent used Trujillo's funds for his own purposes, but the Hearing Board does not find clear and convincing evidence on that point. Respondent testified that his operating account balance never fell below $1,000.00, and we do not have any evidence that Respondent spent the funds in question. Nonetheless, Respondent's mere act of transferring the funds into his operating account amounts to a violation of Colo. RPC 1.15(a).

Respondent cannot, of course, hide behind a mistaken view of the rule. See In re Fisher , 202 P.3d 1186, 1198 (Colo. 2009) (citation omitted) ("All Colorado attorneys are presumed to be aware of the Rules of Professional Conduct and their impact.").

See Ky. Bar Ass'n v. Dixon , 373 S.W.3d 444, 448 (Ky. 2012) (determining that a lawyer violated Rule 1.15 by mishandling funds, even though he was not providing legal representation per se regarding those funds, because the lawyer's actions "were an extension of his legal relationship" with the owner of the funds).

Ex. S7 at 19-20.

Emphasis added.

Further, Respondent did not identify "each separate person" for whom he held money, because he failed to record the funds under both Trujillo's and Ramos's names. He should have recorded both names because Trujillo was the person who entrusted him with the funds, while the funds were paid for work to be performed on Ramos's behalf.

Found in ABA Annotated Standards for Imposing Lawyer Sanctions (2015).

See In re Roose, 69 P.3d 43, 46-47 (Colo. 2003).

We find that Ramos was a prospective client at minimum.

ABA Annotated Standards for Imposing Lawyer Sanctions at xxi; see also People v. Foreman , 966 P.2d 1062, 1065 (Colo. 1998) ("Ignorance of the requirements of a Rule of Professional Conduct does not transform knowing conduct into conduct that is merely negligent.").

In re Sather , 3 P.3d 403, 409 (Colo. 2000) ; see also People v. McGrath , 780 P.2d 492, 493-94 (Colo. 1989) ("Commingling a client's funds with those of the lawyer is a serious violation ..., even in the absence of an actual loss to the client, because the act of commingling subjects the client's funds to the claims of the lawyer's creditors.").

Although we find Standard 4.12 the most appropriate standard to apply to Respondent's mishandling of funds, given that Ramos was at a minimum a prospective client, Standard 7.2 could also apply to this misconduct.

See ABA Standards 9.21 & 9.31.

See People v. Williams , 845 P.2d 1150, 1153 n.3 (Colo. 1993) (finding that an earlier suspension should be considered as a pattern of misconduct rather than as prior discipline where most of the misconduct in the then-pending case took place before the imposition of the earlier suspension).

In re Fischer , 89 P.3d 817, 821 (Colo. 2004).

See In re Attorney F. , 285 P.3d 322, 327 (Colo. 2012) ; In re Fischer , 89 P.3d at 822 (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

In re Attorney F. , 285 P.3d at 327 (quoting In re Rosen , 198 P.3d 116, 121 (Colo. 2008) ).

Id .

See ABA Standard 2.3; see also In re Cummings , 211 P.3d 1136, 1140 (Alaska 2009) (imposing a three-month suspension based on a six-month "baseline" set forth in ABA Standard 2.3, considered in conjunction with applicable mitigating factors); In re Moak , 205 Ariz. 351, 71 P.3d 343, 348 (2003) (noting that the presumptive suspension period is six months); In re Stanford , 48 So.3d 224, 232 (La. 2010) (imposing a six-month deferred suspension after considering the "baseline sanction" of six months served and deviating downward from that sanction based on one aggravating factor, four mitigating factors, and no actual harm caused); Hyman v. Bd. of Prof'l Responsibility , 437 S.W.3d 435, 449 (Tenn. 2014) (describing a six-month served suspension as a baseline sanction, to be increased or decreased based on aggravating or mitigating circumstances); In re McGrath , 174 Wash.2d 813, 280 P.3d 1091, 1101 (2012) ("If suspension is the presumptive sanction, the baseline period of suspension is presumptively six months.").

See, e.g., People v. Schaefer , 938 P.2d 147, 150 (Colo. 1997) (imposing two-year suspension); People v. Galindo , 884 P.2d 1109, 1112 (Colo. 1994) (imposing suspension for one year and one day). But see People v. Shidler , 901 P.2d 477, 480 (Colo. 1995) (imposing public censure with conditions in view of predominating mitigating factors).

McGrath , 780 P.2d at 493.

See People v. Richardson , 820 P.2d 1120, 1121 (Colo. 1991) ; cf. In re Cleland , 2 P.3d 700, 705 (Colo. 2000) (commenting that mitigating factors are considered in order to assess the danger that a lawyer poses to the public).

The Hearing Board also is troubled by his callousness toward Trujillo and Ramos. Respondent made a number of disparaging allegations about Ramos, for example by asserting that he "fraudulently" married Trujillo, without offering any support.

We note some concerns about Respondent's fitness to practice law stemming from his self-representation in this disciplinary matter. As one example, Respondent told us that he had not recently reviewed the ABA Standards , which are of course the primary legal authority guiding this case. As a result, he failed to make a presentation relevant to the sanctions analysis. As another example, Respondent's motion to discharge his 2016 disciplinary order was improperly filed under the instant case rather than the relevant case, and the substance of the motion was wholly without merit. Respondent's motion to dismiss presents similar concerns as to his ability to present coherent legal analysis.

In general, an order and notice of sanction will issue thirty-five days after a decision is entered under C.R.C.P. 251.19(b). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.